IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE WENTZ, | ) | CASE NO.  1:19-CV-00734-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JONATHAN D. GREENBERG |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Michelle Wentz ("Plaintiff" or "Wentz"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED.

## I.  PROCEDURAL HISTORY

In November 2016, Wentz filed an application for POD and DIB, alleging a disability onset date of September 6, 2016 and claiming she was disabled due to "fibromyalgia, major depressive disorder, spondylosis of lumbar [sic], chronic pain of both shoulders, anxiety, chronic pain of both knees, myofascial muscle pain, bursitis, tendonitis, [and] lumbar facet arthropaty [sic]."  (Transcript ("Tr.") 477-

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

78.)  The application was denied initially and upon reconsideration, and Wentz requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 17.)

On May 1, 2018, an ALJ held a hearing, during which Wentz, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 6, 2018, the ALJ issued a written decision finding Wentz was not disabled.  (*Id.* at 17-26.)  The ALJ's decision became final on March 18, 2019, when the Appeals Council declined further review.  (*Id.* at 1-8.)

On April 3, 2019, Wentz filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17, 18.)  Wentz's brief presents the following issues:

(1)    Whether the ALJ erred at step two of the sequential evaluation process when he failed to consider Ms. Wentz's diagnosis of fibromyalgia.

(2)    Whether the ALJ's residual functional capacity finding is supported by substantial evidence when the ALJ unreasonably found that Ms. Wentz requires a cane only for ambulation.

(Doc. No. 15.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Wentz was born in September 1966 and was 51 years old at the time of her administrative hearing (Tr. 25), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(d).  She has a limited education and is able to communicate in English.  (Tr. 25.) She has past relevant work as a linen room attendant and a cleaner, housekeeping.  (*Id*. at 24.)

2

**B.      Medical Evidence[2]**

In 2015, Wentz began experiencing bilateral shoulder pain. (*Id.* at 711-21.)  Yuji Umeda, M.D., Ph.D., prescribed physical therapy.  (*Id.* at 718-19.)  Wentz did not attend follow up sessions and her physical therapy was discontinued.  (*Id.* at 710-14.)

On January 12, 2016, Wentz saw Dr. Umeda for follow-up regarding her worsening bilateral shoulder pain.  (*Id.* at 706-07.)  Dr. Umeda noted Wentz walked without assistance, had full strength in her upper extremities, and found mild tenderness in the left shoulder.  (*Id.* at 707-08.)  Dr. Umeda diagnosed bilateral shoulder impingement and subacromial/subdeltoid bursitis.  (*Id.* at 708.)

On April 7, 2016, Wentz saw Mary Bauer, PA-C, for follow up.  (*Id.* at 699.)  Klonopin was helping Wentz's anxiety, she was sleeping better, her mood was okay, and she denied depression.  (*Id.*)  Wentz complained of ongoing bilateral shoulder pain.  (*Id.* at 700.)

On June 14, 2016, Wentz saw PA-C Bauer complaining of acute pain in her shoulders and across her back, up to her posterior neck.  (*Id.* at 693.)  Bauer ordered a consultation with physical therapy.  (*Id.* at 693-94.)

On June 29, 2016, Wentz saw PA-C Bauer for follow-up and asked for a refill of Klonopin.  (*Id.* at 692.)

On July 18, 2016, Wentz went to the Employee Walk-In Clinic at the Cleveland Clinic complaining of generalized body pain for the past year.  (*Id.* at 689-90.)  The pain began as bilateral shoulder pain, which had been diagnosed as bursitis and tendinitis, for which she had received cortisone injections and done physical therapy.  (*Id.* at 690.)  She reported she now had pain throughout her entire body.  (*Id.*)  Her pain had gotten progressively worse, and significantly worse in the past three months.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(*Id.*)  She was very fatigued, and her appetite had decreased.  (*Id.*)  In addition, she complained of paresthesia,[3] numbness, and weakness in her shoulders through her hands bilaterally.  (*Id.*)  An examination found a normal gait and diffuse pain in all locations of the body with light palpation.  (*Id.* at 691.)  The treatment notes state, "difficulty to assess trigger points for fibromyalgia 2/2 generalized allodynia."[4]  (*Id.*)

On July 20, 2016, Wentz began physical therapy for her bilateral shoulder and upper back pain. (*Id.* at 686.)  Wentz told her physical therapist she hurt all over.  (*Id.*)  Wentz rated her shoulder pain as 9/10 and described it as "ache to burning to weakness" and "constant."  (*Id.*)  Wentz rated her upper back pain as 8-9/10 and described it as "ache to stiffness to burning" and "constant."  (*Id.*)  Sitting and standing worsened her pain, while lying down alleviated it.  (*Id.*)  Wentz's pain kept her from falling asleep and woke her up while sleeping.  (*Id.*)  The physical therapist noted Wentz's gait was fair, she was not using an assistive device, and she "[g]rimaced with all MMT."  (*Id.* at 687.)  An examination revealed tenderness to palpation at the suboccipital bilaterally with tightness, as well as tightness/spasm of the inferior upper trapezius bilaterally, in addition to abnormal sensation.  (*Id.* at 687-88.)

On July 26, 2016, Wentz returned for her second physical therapy session.  (*Id.* at 683.)  The physical therapist noted Wentz walked "very slowly" with her arms "hanging."  (*Id.*)  He also noted Wentz exhibited poor compliance during the session and "no follow through w/ home exercises."  (*Id.* at 684.)  Wentz attended three more physical therapy sessions into August 2016; she showed improvement during one but complained of ineffectiveness during the other two.  (*Id.* at 679-83.)

---

[3] "[A]n abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 90 1371 (30th Ed. 2003).
[4] "[P]ain resulting from a non-noxious stimulus to normal skin."  *Id.* at 51.

4

On August 19, 2016, Ms. Wentz reported that physical therapy was not helping.  (*Id.* at 677-78.) Wentz complained of pain in the whole top half of her body, including both shoulders, across her back, and her low back.  (*Id.*)  PA-C Bauer noted "[l]ots of somatic complaints."  (*Id.*)  She also wrote, "Consider fibromyalgia as **diagnosis**."  (*Id.*) (emphasis in original).

An August 22, 2016 x-ray of Wentz's cervical spine revealed early bilateral facet arthropathy and mild foraminal stenosis at C3-4.  (*Id.* at 737-38.)

A September 26, 2016 ultrasound of Wentz's right shoulder revealed mild tendinosis of the subscapularis, findings consistent with chronic bursitis, moderate supraspinatus tendinosis, mild-to-moderate tendinosis of the infraspinatus, bursal impingement, degeneration of the posterior labrum, and mild hypotrophic arthropathy of the acromioclavicular joint.  (*Id.* at 734-35.)  There was a five-millimeter partial thickness tear in the supraspinatus.  (*Id.* at 735.)

On October 7, 2016, Wentz saw Matthew Bunyard, M.D., for a rheumatology consult regarding her widespread pains.  (*Id.* at 666.)  Wentz reported her pain began in 2010 and started in her shoulders bilaterally.  (*Id.* at 667.)  Over the past year, the pain had spread to her back, hips, arms, upper neck, and posterior scalp, as well as "very mildly" in her knees and ankles "intermittently."  (*Id.*)  Everything hurt, the pain often made her cry, and it hurt to be touched or even hugged.  (*Id.*)  Wentz described her pain as constant throughout the day and it woke her during the night.  (*Id.*)  She also felt fatigued.  (*Id.*)  An examination revealed moderate tenderness to light palpation of the upper extremities and shoulders bilaterally, as well as in the upper back and upper neck.  (*Id.* at 668.)  Dr. Bunyard found Wentz's joints very stiff and resistant to movements, as well as decreased range of motion at her shoulders, knees, and hips bilaterally.  (*Id.*)  Wentz's gait was slow but normal.  (*Id.*)  Dr. Bunyard concluded Wentz's symptoms were "concerning for fibromyalgia or chronic pain syndrome" and noted the diagnosis was most likely fibromyalgia.  (*Id.* at 670.)

5

On November 9, 2016, Wentz underwent a functional capacity evaluation ("FCE").  (*Id.* at 661.) Wentz gave inconsistent effort and unreliable pain reports during the testing.  (*Id.*)  The results were based on demonstrated biomechanics.  (*Id.*)  The FCE revealed Wentz could work part-time within the sedentary physical demand category, sitting for up to three hours and twenty-four minutes, and standing for up to two hours through the work day.  (*Id.* at 662.)

On November 18, 2016, Wentz went to the Pain Management Center at the Cleveland Clinic for evaluation of her bilateral shoulder, neck, bilateral hip, and bilateral knee pain.  (*Id.* at 653-54.)  Wentz reported the symptoms began years ago and were worsening.  (*Id.* at 654.)  Wentz rated her pain as a 7/10 and described it as constant, aching, burning, and stabbing.  (*Id.*)  Activity made the pain worse, while resting and heat made it better.  (*Id.*)  Pasha Saeed, M.D., noted Wentz was positive for fatigue, generalized pain, depression, sleep disturbance, and anxiety.  (*Id.* at 656-57.)  A physical examination found: (1) tenderness over the trapezius muscles bilaterally; (2) tenderness over the lumbar facets bilaterally; (3) facet loading by extension and flexion of the lumbar spine caused back pain; (4) antalgic gait; (5) limited range of motion in the neck, hips, knees, shoulders, and spine; and (6) diffuse tenderness over the cervical and lumbar area.  (*Id.* at 657, 659.)

That same day, Wentz underwent x-rays of her cervical and lumbar spine.  (*Id.* at 729-31.)  The x-ray of the lumbar spine revealed mild lumbar levoscoliosis.  (*Id.* at 731.)

On November 23, 2016, Wentz saw Dr. Saeed and complained of pain all over, but especially in her right shoulder.  (*Id.* at 652.)  Wentz rated her pain as 9/10.  (*Id.*)  Wentz received a right shoulder joint injection.  (*Id.*)

On December 2, 2016, Wentz returned to the Cleveland Clinic for a follow up examination, complaining of constant pain in her lower back, neck, shoulders, and hips.  (*Id.* at 647.)  Wentz rated her pain as 9/10 and said the nerve block did not help.  (*Id.*)  An examination revealed Wentz had "exquisite

6

tenderness to palpation of the back." (*Id.* at 649.) Haris Riaz, M.D., noted Wentz's presentation was concerning for fibromyalgia. (*Id.*)

On December 22, 2016, Wentz underwent an initial psychiatric evaluation. (*Id.* at 856.) Ann Pressler, CNP, noted Wentz did not know why she was there and had concerns about short term disability. (*Id.*) Wentz presented with a slowed gait secondary to back pain, and she was tearful at times. (*Id.*) CNP Pressler noted a prior diagnosis of major depressive disorder, which Wentz refuted. (*Id.* at 857.) CNP Pressler determined Wentz had an adjustment disorder secondary to pain but did not require further psychiatric evaluation at the time as her "emotional stress appeared to be situational in nature." (*Id.* at 859.)

On December 23, 2016, Wentz went to the Pain Management Center. (*Id.* at 812.) She reported that her shoulder injection had not helped after the lidocaine wore off. (*Id.* at 814.) Wentz complained of pain, numbness, and weakness in her right arm as the worst of her pain. (*Id.*) She also reported constant pain in her shoulders, arms, and down her back to her hips. (*Id.*) The treatment notes reflect Wentz failed conservative therapy. (*Id.*)

On December 29, 2016, Wentz underwent an initial evaluation at the Cleveland Clinic's Neurological Center for Pain Evaluation. (*Id.* at 809.) Wentz reported constant, aching, burning, stabbing pain from the vertex to sacrum and in bilateral shoulders, hips, and knees. (*Id.* at 810.) Wentz's skin was hypersentive to touch. (*Id.*) Weight bearing increased her pain, while rest and heat decreased it. (*Id.*) Wentz rated her average pain as 7-8/10. (*Id.*) Examination findings included: (1) a normal gait with slow cadence; (2) inability to heel/toe walk due to pain; (3) cervical and lumbar range of motion limited in all planes; (4) giveaway weakness throughout with strength testing; and (5) diffuse tenderness to light touch throughout with extreme overreaction. (*Id.* at 812.) Wentz flinched and yelled during reflex testing. (*Id.*) The treatment notes reflect Wentz's "[a]ffect was jocular[,] which is inconsistent with her level of

7

disability." (*Id.*) Diagnoses included fibromyalgia, cervicalgia, mechanical low back pain, and adjustment disorder secondary to pain. (*Id.*) Joanne Schneider, DNP, RN, CNP, recommended a daily rehabilitation program, but Wentz felt this was not an option because of childcare issues. (*Id.*)

On January 24, 2017, Wentz saw PA-C Gawry complaining of back, neck, shoulder, and knee pain. (*Id.* at 903.) Wentz reported she had very poor sleep habits and felt unrested in the morning. (*Id.*) She also complained of headaches associated with her pain. (*Id.*) On examination, Gawry found Wentz had a mildly impaired gait, mild pain to palpation in the cervical and lumbar spine midline and over the paraspinal muscles, and limited back flexion and extension. (*Id.* at 904.) Gawry ordered Wentz to return the next day for a nerve block procedure with Dr. Saeed. (*Id.* at 905.) Dr. Saeed administered low-back nerve blocks. (*Id.* at 901-02.)

A February 1, 2017 MRI of Wentz's right shoulder revealed displaced tendinosis with small low-grade partial thickness articular sided tear, interstitial/delaminating tear with a rotator cuff cyst, and subscapularis and intra-articular biceps tendinosis. (*Id.* at 863-64.)

On February 8, 2017, Wentz underwent a second nerve block with Dr. Saeed for her back, although the first one provided no relief. (*Id.* at 898.)

On February 13, 2017, Wentz consulted with rheumatologist Elisabeth Ray, M.D. (*Id.* at 893.) Dr. Ray noted Wentz had fatigue, sicca, chronic back pain, morning stiffness, neuropathy, and salivary pooling. (*Id.* at 893-94.) On examination, Dr. Ray found Wentz had widespread tenderness to palpation of both articular and non-articular sites. (*Id.* at 895.) Dr. Ray determined Wentz had a "chronic pain disorder consistent with fibromyalgia" and emphasized treatment consisting of sleep, exercise, and optimal treatment of depression. (*Id.*) Wetnz declined a physical therapy referral, and Dr. Ray emphasized the importance of regular aerobic exercise, particularly aquatic therapy. (*Id.*)

On February 14, 2017, PA-C Bauer completed a Medical Source Statement.  (*Id.* at 829-31.) Bauer had seen Wentz 14 times since April 8, 2011 and her last appointment was November 17, 2016. (*Id.* at 829.)  Bauer reported Wentz's diagnoses included chronic depression/anxiety, chronic pain, chronic back pain, chronic shoulder pain, fibromyalgia, lumbosacral spondylosis, and pre-diabetes.  (*Id.*)  Bauer opined Wentz's chronic pain and job and family stress lead to emotional depression and anxiety.  (*Id.*) When asked to identify clinical findings, laboratory findings, and diagnostic test results which supported Wentz's diagnosis, Bauer wrote "see chart," but no chart is attached to her opinion in the record.  (*Id.*) When asked to estimate Wentz's functional limitations in a competitive work situation, Bauer wrote "see attached," but again nothing is attached to her opinion in the record.  (*Id.* at 830.)  Bauer opined Wentz would "often" need unscheduled breaks and would be off-task more than 25 percent of the time.  (*Id.*) Bauer further opined emotional stress may lead to confrontation with coworkers.  (*Id.* at 831.)  Bauer concluded Wentz could not work.  (*Id.*)

On February 22, 2017, Wentz returned to Dr. Saeed for another nerve block.  (*Id.* at 890.)  She reported receiving good relief for several days after the previous nerve block.  (*Id.*)

On March 6, 2017, Wentz saw William Welches, M.D., at the Cleveland Clinic Pain Management Center complaining of right-side shoulder pain, low back pain, and bilateral knee pain.  (*Id.* at 1004.) Treatment notes reflect Wentz was anxious and upset.  (*Id.*)  In addition to her pain, Wentz reported numbness and tingling.  (*Id.*)  Wentz described her pain as achy, worse with sitting or standing for long periods of time, and better with heat.  (*Id.* at 1006.)  She walked her grandson to school and could walk an hour before she began to feel discomfort.  (*Id.*)  Dr. Welches found Wentz had an "apparent high sensitivity to treatment" and recommended she not proceed with OMT treatment as a result.  (*Id.* at 1007.)

On March 24, 2017, Wentz saw PA-C Gawry for an assessment of her shoulder pain, neck pain, and "all over" pain.  (*Id.* at 1012.)  In addition to her pain, Wentz complained of numbness, tingling, and

9

weakness.  (*Id.*)  On examination, Gawry found Wentz had a normal gait, moderate pain to palpation in the lumbar spine midline and over the paraspinal muscles, and good flexion and extension, but which induced facet loading.  (*Id.* at 1014.)  Gawry noted Wentz had fibromyalgia complaints.  (*Id.*)  Gawry recommended she continue her medications, remain active, use the exercises from physical therapy, and apply heat.  (*Id.*)

On April 7, 2017, Wentz saw Sunny Lee, D.O., and Andrew Lewis, D.O., to transfer care and to have her chronic pain assessed.  (*Id.* at 929.)  Wentz reported she received minimal to no relief from her medications, and no relief from her steroid injections.  (*Id.*)  Wentz described her diffuse pain as achy, stabbing, and throbbing pain, and rated its intensity as 10/10.  (*Id.*)  Wentz's pain also made it difficult for her to walk with a steady gait.  (*Id.*)  Wentz had shoulder surgery scheduled for June.  (*Id.*)  A physical examination revealed diffuse pain to palpation in the paravertebral areas, "most pronounced in the low lumbars and upper thoraolos," and tenderness in the posterior knees, medial scapular region, and low cervical regions.  (*Id.* at 931.)  Light palpation during the musculoskeletal exam caused "significant distress."  (*Id.*)  Wentz exhibited an unsteady gait while walking to the exam table.  (*Id.*)

In their assessment, Drs. Lee and Lewis reported Wentz had an existing fibromyalgia diagnosis. (*Id.* at 934.)  They determined Wentz had "pain at classic tender points for fibromyalgia including her knees, hip, low back, medal scapular border and neck."  (*Id.* at 935.)  They also determined Wentz had gait instability due to pain from her fibromyalgia and prescribed a cane for stability.  (*Id.*)

On May 1, 2017, Wentz saw Marzena Buzanowska, M.D., complaining of low back pain radiating to her hips, thighs, and right foot.  (*Id.* at 941.)  Wentz told Dr. Buzanowska the pain in her back was the worst and her thighs felt very sore.  (*Id.*)  Wentz also complained of achiness, stiffness, and tingling in the front of both her knees.  (*Id.*)  Wentz further reported neck pain and headaches.  (*Id.*)  Wentz described her pain as constant, worse with any activity, and severe in the past month.  (*Id.*)  Wentz also told Dr.

10

Buzanowska her legs were weak sometimes, she had poor balance, and she felt she was losing strength and dexterity in her hands. (*Id.*) Dr. Buzanowska found Wentz unable to heel/toe or tandem walk. (*Id.* at 944.) On examination, Dr. Buzanowska found: tenderness to palpation throughout the entire lumbar spine, spinous processes, and bilateral paraspinal muscles; pain and decreased range of motion in the spine; positive straight leg raising test; and decreased strength in the bilateral ankles and shoulders. (*Id.* at 944-45.) Dr. Buzanowska also diagnosed an "[a]bnormality of gait due to impairment of balance." (*Id.* at 949.)

A May 8, 2017 x-ray of Wentz's bilateral knees revealed minimal narrowing of the medial femoral tibial joint spaces bilaterally. (*Id.* at 1019-20.) MRIs of Wentz's cervical and lumbar spine on taken later that month were normal. (*Id.* at 1022-1025.)

On May 22, 2017, Wentz returned to the Rheumatology Clinic. (*Id.* at 974.) Wentz continued to complain of pain. (*Id.*) Wentz reported she recently restarted Gabapentin a few weeks ago, which helped. (*Id.*) In the section "Rheumatologic Review of Symptoms," Dr. Ray noted the following: fatigue; swelling in the feet or legs; joint pain; joint swelling; morning stiffness in joints; muscle weakness; back pain; headaches; and numbness or tingling. (*Id.*) A physical examination revealed widespread tenderness to palpation in both articular and nonarticular sites, as well as salivary pooling. (*Id.* at 978.) Dr. Ray's visit diagnosis was fibromyalgia. (*Id.* at 979.) Dr. Ray recommended for the second time Wentz see neurological pain management. (*Id.*) Wentz did not need a follow up with rheumatology as she would be better managed by a chronic pain program. (*Id.*) Dr. Ray increased Wentz's Gabapentin dose and referred her to integrative medicine for a non-pharmacologic approach. (*Id.*)

On June 6, 2017, Wentz underwent surgery for her right shoulder impingement, rotator cuff tear, and labral tear. (*Id.* at 1053.) On June 16, 2017, Wentz began physical therapy for her right shoulder. (*Id.* at 1107.) During the initial evaluation, the physical therapist noted Wentz walked independently with

11

a cane held in her left hand. (*Id.* at 1109.) Wentz reported she had used a cane since April 2017 because she felt "unsteady/unstable." (*Id.*) The treatment notes reflect Wentz appeared overwhelmed by pain, was tearful at times, avoided bearing much weight on her left leg, and rocked/shifted position constantly because of pain at multiple sites. (*Id.*)

In June 2016, at her next two physical therapy sessions, the physical therapist reported Wentz "jump[ed] and squirm[ed] all over mat [sic] at the slightest touch or movement" of her right arm (*id.* at 1157, 1164) and she appeared non-compliant with all range of motion exercises. (*Id.* at 1158, 1165.) After an otherwise positive fourth appointment (*id.* at 1171-72), at Wentz's next two appointments she exhibited "significant guarding." (*Id.* at 1178-79, 1185-86.) By her seventh appointment, Wentz had "partially achieved" some of her goals. (*Id.* at 1194.) At her eighth appointment, Wentz reported a decrease in pain with that day's therapy session. (*Id.* at 1202-03.)

On July 19, 2017, Wentz saw orthopedic surgeon James S. Williams, Jr., M.D., for a post-operative visit regarding her right shoulder. (*Id.* at 1210.) Wentz was still complaining of shoulder discomfort but was able to move it a little bit during physical therapy. (*Id.*) Wentz reported she had recently fallen and landed on her right shoulder, and Dr. Williams believed that had "clearly set her back some." (*Id.*) Dr. Williams gave Wentz a cortisone injection and advised her to keep her arm immobilized and continue with therapy. (*Id.*)

On July 25, 2017, Wentz she returned to Dr. Buzanowska for her complaints of neck and low back pain. (*Id.* at 1216.) Wentz reported the pain in her neck and at the base of her head gave her a headache and she had tightness at the top of her shoulders. (*Id.*) Her low back pain felt like pressure and throbbing. (*Id.*) Wentz also reported tingling in her right foot, throbbing/achiness in both legs, occasional leg weakness, and her balance being off. (*Id.*) Wentz told Dr. Buzanowska that she did not sleep at night

12

because of the pain.  (*Id.*)  On examination, Dr. Buzanowska found Wentz had severe tenderness to superficial light touch over the right lateral ankle.  (*Id.* at 1221.)  Dr. Buzanowska suspected Wentz's neck pain (and resulting headaches) were myofascial in nature.  (*Id.*)  Dr. Buzanowska also suspected Wentz's low back and leg pain was myofascial in nature with a "strong component of chronic pain and peripheral sensitization."  (*Id.*)  Dr. Buzanowska also noted Wentz's "very abnormal" gait.  (*Id.*)

On July 27, 2017, Wentz returned for her ninth physical therapy appointment.  (*Id.* at 1233.)  The physical therapist noted Wentz had "poor tolerance to even light touch" and was "progressing slower than normal" because of high pain levels and avoidance.  (*Id.* at 1233-34.)

On August 1, 2017, Wentz went to her tenth physical therapy appointment and reported she had not been doing her therapy as much because of a death in her family.  (*Id.* at 1241.)  Wentz complained of low back pain that was affecting her walking and she was using a cane.  (*Id.*)  The physical therapist found Wentz had partially achieved some of her goals.  (*Id.* at 1242.)  Wentz retuned two days later for her eleventh appointment, walking with a cane and exhibiting an antalgic gait while "carrying a very large purse."  (*Id.* at 1259.)  Wentz told her physical therapist, "I was told that I have some sort of over sensativity [sic] and cannot tolerate when people touch me."  (*Id.*)  On August 9, 2017, Wentz returned for her twelfth appointment and told the physical therapist she believed she had "RSD," although it "might be" her fibromyalgia.  (*Id.* at 1266.)  The physical therapist noted Wentz walked with a cane and an antalgic gait, tolerated the session fairly because of "hypersensitivity," and continued with "facial grimacing" during shoulder exercises.  (*Id.* at 1267.)

On August 11, 2017, PA-C Bauer completed an updated Medical Source Statement.  (*Id.* at 1118-1121.)  Bauer last saw Wentz that day.  (*Id.* at 1119.)  Wentz's diagnoses consisted of chronic depression/anxiety, neck arthritis, RSD, chronic shoulder pain, fibromyalgia, lumbosacral spondylosis,

13

and chronic low back pain.  (*Id.*)  When asked to identify clinical findings, laboratory findings, and diagnostic test results which supported Wentz's diagnosis, Bauer wrote "see medical records."  (*Id.*)  When asked to estimate Wentz's functional limitations in a competitive work situation, Bauer wrote "see attached," but nothing is attached to her opinion in the record.  (*Id.* at 1120.)  Bauer opined Wentz would "often" need to take unscheduled breaks during a work day.  (*Id.*)  Bauer reported Wentz had trouble walking, she used a cane, and had a right arm sling.  (*Id.*)  Bauer again opined Wentz would be off-task more than 25 percent throughout an eight-hour work day and she was unable to work. (*Id.*at 1120-21.)

On August 16, 2017, Wentz attended her fourteenth physical therapy appointment.  (*Id.* at 1281.)  Wentz wore her sling and walked with a cane, with her weight shifted over her left leg.  (*Id.*)  Wentz showed poor tolerance to therapy and performed the exercises slowly.  (*Id.* at 1282.)  Wentz also complained of "skin pain" of the right lateral neck.  (*Id.*)  At her next appointment, Wentz told the physical therapist her back and neck pain prevented her from having better compliance with therapy and that she had been diagnosed with fibromyalgia last year.  (*Id.* at 1288.)  The physical therapist noted, "Patient sometimes drags her R foot on tile floor, she limps and favors her right foot as well. She perseverates on all the other pains she has in her body but can perform well with the peach band to 45° of external rotation at the end of the first set of 10."  (*Id.* at 1289.)

On September 7, 2017, Wentz saw Dr. Williams for her three-month post-operative visit.  (*Id.* at 1306.)  Dr. Williams noted Wentz's shoulder was doing well but she had increasing pain everywhere else.  (*Id.*)  Dr. Williams opined Wentz needed a good work-up from an internist as "her systemic issues were a much bigger problem."  (*Id.*)

On September 8, 2017, Wentz had her sixteenth physical therapy visit.  (*Id.* at 1296.)  Wentz complained of pain all over her body and that she had been unable to get out of bed a couple of days. (*Id.*)  The physical therapist observed Wentz ambulated with a straight cane with a very antalgic gait pattern,

14

dragging her right leg, and was wearing a back brace. (*Id.*) The treatment notes reflect Wentz's "severe pain" all over her body limited her ability to follow through with the home exercise program. (*Id.* at 1298.)

On September 18, 2017, Wentz attended another physical therapy session complaining that her whole body hurt, particularly her right shoulder, hip, and knee. (*Id.* at 1314.) She walked with a cane in her left hand and her right arm hung "limply" at her side. (*Id.*) The physical therapist noted Wentz's pain "all over [her] body interferes with [her] ability to perform right shoulder exercises. She perseverates on all her pain and is fearful of moving." (*Id.* at 1315.)

On October 30, 2017, Wentz went to the Cleveland Clinic emergency room gasping for air and refusing to talk until she was admitted and placed in a hospital bed. (*Id.* at 1454.) Wentz complained of all over body aches, a headache all over her head, no energy, and sleepiness. (*Id.* at 1456.) Wentz reported her legs felt weak and "like fluid" and she had weakness all over. (*Id.*) Wentz said she had received a cortisone shot in her shoulder that morning. (*Id.*) She asked for "something for her fibromyalgia at home." (*Id.* at 1459-60.) A subsequent CT scan of Wentz's brain was normal. (*Id.* at 1459.) A neurological assessment was also normal and noted steady balance/gait and no muscle weakness/atrophy. (*Id.* at 1473-74.) A musculoskeletal assessment found "full movement with no pain, injury, or assistive devices." (*Id.* at 1475.) The hospital discharged Wentz the same day, diagnosing her with a likely fibromyalgia exacerbation. (*Id.* at 1469-71.) Treatment providers gave Wentz Benadryl and pain medication. (*Id.* at 1459-60.)

On November 6, 2017, Wentz returned to physical therapy. (*Id.* at 1478.) The physical therapist noted an almost two-month absence from physical therapy. (*Id.*) Wentz reported severe pain all over her body, pain in her neck down to her right shoulder and right arm to her fingers, pain in her low back, especially her tailbone, pain in both knees with leg numbness from her knees to her feet (right worse than

15

left), and severe migraines from the sides of her head to the back of her head. (*Id.* at 1479.) Wentz walked with a cane in her left hand, reported a history of frequent falls, and avoided weight bearing on her right leg. (*Id.* at 1480.)

On November 16, 2017, Wentz attended another physical therapy session, this time to address not her shoulder but her "multiple other pain complaints." (*Id.* at 1488.) Wentz reported a fall a month prior and another the week before her session. (*Id.* at 1489.) She also complained that she felt like her body had "been in a fire" and that her skin was so sensitive to touch. (*Id.*) The physical therapist noted Wentz walked with a cane held in her left hand "with very flexed posture and much guarding." (*Id.* at 1490.) She had a "very narrow base of support, absent heel strike," dragged her feet, and kept her "hips and knees slightly flexed during stance." (*Id.*)

On December 21, 2017, Wentz went to the Cleveland Clinic's Pain Management Center complaining of generalized body pain. (*Id.* at 1502.) Wentz reported her pain interfered with her sleep and she awoke in the morning feeling unrested. (*Id.*) Wentz stated that her pain also interfered with her ability to concentrate. (*Id.* at 1504.) A physical examination revealed "exquisite pain to palpation over B/l shoulders and overall back down to buttocks, limited painful flexion and extension, reflexes are 2+ and symmetric, motor and sensory appear to be normal, negative SLR test." (*Id.*) Wentz used a cane and her gait was impaired. (*Id.*) PA-C Gawry diagnosed Wentz with spondylosis and fibromyalgia. (*Id.*) He scheduled Wentz for medial branch nerve blocks at the L3-4 and L4-5 levels. (*Id.*) On December 22, 2017, Wentz received nerve block injections from Dr. Saeed. (*Id.* at 1518.)

On December 28, 2017, Wentz went to the Cleveland Clinic emergency room complaining of shortness of breath and sweating since the night before, as well as slight nausea at times. (*Id.* at 1531.) Wentz's chest was tender to touch. (*Id.* at 1532.) Wentz's chest pain was not consistent with cardiac pain,

16

and the area was very sore.  (*Id.* at 1535.)   The hospital discharged Wentz and recommended she return if her symptoms persisted or worsened. (*Id.* at 1536.)

On January 2, 2018, Wentz returned to the Cleveland Clinic's Pain Management Center.  (*Id.* at 1553.)  Wentz reported "severe, unrelenting pain," although she received a little pain relief that did not last long from her injections.  (*Id.* at 1555.)   On examination, PA-C Gawry found moderate pain to palpation in the lumbar spine midline and limited back flexion and extension.  (*Id.*)   He also found tenderness to palpation from shoulder to wrist on Wentz's right side.  (*Id.*)  Gawry noted Wentz's gait was impaired and she used a cane.  (*Id.*)  Gawry directed Wentz to continue her Cymbalta and Gabapentin and referred her to the Cleveland Clinic's Spinstitute.  (*Id.*)

On April 10, 2018, Stan Fireman, LISW-S, completed a Mental Residual Functional Capacity Assessment.  (*Id.* at 1567-69.)  He reported seeing Wentz for the first time on March 6, 2018 and conducted an initial evaluation on April 10, 2018.  (*Id.* at 1567.)  Fireman reported Wentz had a pain disorder with medical condition and psychological factors.  (*Id.*)  Fireman opined Wentz would be off-task more than 25 percent of an eight-hour work day.  (*Id.*)  He further opined Wentz could not tolerate a repetitive daily routine.  (*Id.* at 1568.)   Fireman found Wentz moderately limited in several areas, markedly limited in her ability to understand and remember very short and simple instructions, carry out very short and simple instructions, and maintain attention and concentration for extended periods, and extremely limited in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  Fireman opined Wentz was not significantly limited in her ability to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id.*)

17

On April 11, 2018, Wentz saw Dr. Williams for follow-up regarding her right shoulder.  (*Id.* at 1571.)  Dr. Williams opined, "At this point I think all her other health issues are getting in the way of her recovering fully from her shoulder surgery so I recommended that she go see the folks a [sic] functional medicine I think he'll be able to evaluate her of such anything she's toxic [sic] and they'll be able to put a program together and hopefully get her off of the medicines which I think a [sic] really doesn't [sic] allow her to feel better . . . ."  (*Id.*)

**C.      State Agency Reports**

**1.      Mental Impairments**

On January 11, 2017, Sandra Banks, Ph.D., opined Wentz had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  (*Id.* at 482-83.)   Dr. Banks limited Wentz to simple, one to three step tasks that require no more than a moderate pace and no more than basic decision making, and no more than occasional interactions with coworkers, supervisors, and the general public.  (*Id.* at 487-88.)  Dr. Banks opined Wentz could adapt to routine, predictable changes in a stable environment.  (*Id.* at 488.)

On March 27, 2017, Courtney Zeune, Psy.D., found on reconsideration Wentz had no restriction in her ability to understand, remember, or apply information, moderate restriction in her ability to interact with others, moderate restriction in her ability to concentrate, persist, or maintain pace, and moderate restriction in her ability to adapt or manage herself.  (*Id.* at 497.)  She affirmed Dr. Banks's mental RFC findings.  (*Id.* at 501-03.)

**2.      Physical Impairments**

On January 11, 2017, Esberdado Villanueva, M.D., opined Wentz possessed the RFC to perform light work with the following additional limitations: (1) frequently push/pull with the upper extremities;

18

(2) frequently reach in front, laterally, or overhead with both upper extremities; (3) frequently crawl and climb ramps and stairs; and (4) occasionally climb ladders, ropes, and scaffolds.  (*Id.* at 484-86.)

On March 19, 2017, Lynn Torello, M.D., opined identical findings on reconsideration as Dr. Villanueva found on initial review.   (*Id.* at 499-501.)

**D.    Hearing Testimony**

During the May 1, 2018 hearing, Wentz testified to the following:

- She completed the tenth grade.  (Tr. 1582.)

- She left her job at the Cleveland Clinic in 2016 because of chronic pain.  (*Id.* at 1585.) She currently experiences pain in her shoulder, back, neck, feet, knees, and hands. (*Id.*)

- She has a hard time lifting, opening jars, or pushing with her right upper extremity. (*Id.* at 1585-86.)  She can lift five to ten pounds; anything heavier than that would cause pain and she would drop it.  (*Id.* at 1586.)

- She thought she could be on her feet about an hour and a half in an eight-hour work day.  (*Id.*)

- She has used a cane since April 2017.  (*Id.*)  She uses the cane for balance.  (*Id.* at 1586-87.)  She cannot walk without the cane, and she cannot stand without holding on to something.  (*Id.*at 1587.)  Dr. Andrew Smith at the Cleveland Clinic prescribed the cane.  (*Id.*)

- She has problems sitting because of her tailbone.  (*Id.*)

- She underwent pain blocks and physical therapy to try and relieve her pain.  (*Id.*)  She currently participates in the Cleveland Clinic's Back on Track program, which teaches people how to manage their pain without drugs.  (*Id.* at 1587-88.)  It is a twelve-week program.  (*Id.* at 1588.)  She started in March and attends twice a week.  (*Id.*)

- She currently takes Cymbalta, ibuprofen, trazodone, and Topamax for her conditions. (*Id.*)  She also uses a Lidocaine ointment and another topical cream to desensitize her skin and for her skin pain.  (*Id.*)  Her medications help very little.  (*Id.* at 1589.)  She also uses a heating pad and hot/cold packs, in addition to walking and stretching, to relieve her pain.  (*Id.*)

- She is most comfortable laying down.  (*Id.*)  She lays down about an hour and a half or so a day.  (*Id.*)

19

- She lives alone.  (*Id.*)  Her grandson lived with her until February.  (*Id.* at 1592.)  Her daughters and her mom help with the chores, including cooking, mopping, and shopping.  (*Id.* at 1590.)  She may wash the dishes, but she can only do so for four to five minutes before she needs to stop and take a 30-minute break.  (*Id.*)  She likes to read and crochet, but her pain interferes with her ability to do these things.  (*Id.* at 1590-91.)  She does not watch television.  (*Id.* at 1591.)

- She experiences "unbearable flare-ups" three to four times a week that feel like "shooting pain all over."  (*Id.*)

- She receives treatment for depression.  (*Id.* at 1592.)  She gets along with one of her daughters and her mother.  (*Id.*)  She does not see other people.  (*Id.*)

- She does not drive, and she gets around by taking the bus, walking, or Paratransit.  (*Id.* at 1594.)

The VE testified Wentz had past work as a linen room attendant and cleaner, housekeeping.  (*Id.* at 1598.)  The ALJ then posed the following hypothetical question:

> All right, sir, at this time I'd ask you to assume a hypothetical individual with the past jobs you have just described. I would further ask you to assume the hypothetical individual was limited to the following. The hypothetical individual would fall within the exertional category of light, but add the following further restrictions. The hypothetical individual would be limited to frequent reaching over head; would be limited to only occasionally using ramps and stairs; never using ladders, ropes or scaffolds; occasionally balancing, occasionally kneeling, occasionally stooping, crouching and crawling.
>
> The hypothetical individual would be limited -- insofar they would be limited to simple tasks; limited to routine and repetitive tasks; would never be required to operate a motor vehicle during the course of a workday. The hypothetical individual would be limited insofar as they would -- would be limited to occasional interaction with a small group of co-workers where their contact would be casual in nature.  The hypothetical individual would be limited to occasional interaction with the public. And the hypothetical individual would be limited, too, insofar as they would be in need of a static work environment where they could only tolerate a few changes in a routine work setting. However, when said changes did take place, they need to take place gradually and frequently. Mr. Wright, with those restrictions would a hypothetical individual be able to perform the past jobs described earlier in your testimony?

(*Id.* at 1598-99.)

20

The VE testified the hypothetical individual would not be able to perform Wentz's past work as a linen room attendant or cleaner, housekeeping.  (*Id.* at 1600.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, garment sorter, and classifier.  (*Id.*)

The ALJ then added another restriction to the hypothetical:

> If you were to add to the first hypothetical the following further restriction and that would be that due to ongoing and unrelenting pain and/or fear of experiencing said pain, the hypothetical individual would find themselves to be off task 20 percent of a given workday, would such an individual be able to perform the sample jobs that you offered in response to the first hypothetical?

(*Id.* at 1601.)  The VE testified that amount of time off-task would preclude work.  (*Id.*)

The ALJ then posed an additional hypothetical:

> For the next hypothetical, the hypothetical would be around the same restrictions as in the first hypothetical, however a hypothetical individual would require a cane for ambulating. With that further restriction, would a hypothetical individual be able to perform the sample jobs offered in response to the first hypothetical?

(*Id.* at 1602.)  The VE testified if it was just for ambulation, all three positions previously identified would remain.  (*Id.*)  Wentz's attorney asked the VE whether a cane required for standing and walking would affect his answer.  (*Id.* at 1603.)  The VE asked if counsel meant "standing as in terms of balancing."  (*Id.*)  Counsel agreed and clarified that "the individual cannot stand without either holding on to something or using the cane for support.  (*Id.*)  The VE testified such a restriction would limit the individual to sedentary work.  (*Id.*)  The VE also testified there would no transferrable skills as Wentz's work was all of an unskilled nature.  (*Id.* at 1601.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

21

determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Wentz was insured on her alleged disability onset date, September 6, 2016, and remains insured through December 31, 2020, her date last insured ("DLI").  (Tr. 17-18.)  Therefore, in order to be entitled to POD and DIB, Wentz must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The claimant has not engaged in substantial gainful activity since September 6, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: status post right shoulder arthroscopy, superior labral tear from anterior to posterior (SLAP) procedure, arthritis, lumbar sacral spondylosis, anxiety disorder, major depressive disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) except that the claimant can occasionally use ramps and stairs, but can never use ladders, ropes or scaffolds.  The claimant can occasionally balance, kneel, stoop, crouch and crawl.  The claimant is limited to simple, routine and repetitive tasks; the claimant is never required to operate a motor vehicle during the course of a workday.  The claimant is limited to occasional interaction with a small group of co-workers where the contact is casual in nature.  The claimant is limited to occasional interaction with the public.  The claimant is limited to a static work environment, tolerating few changes in a routine work setting and when said changes do occur, they would need to take place gradually and would occur infrequently.  The claimant requires a cane for ambulation.

23

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on September **, 1966 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 6, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-26.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the

24

Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No.

25

11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.   Fibromyalgia

Wentz asserts the ALJ was required to consider all the evidence in the case record at Step Two to determine whether there is a severe medically determinable impairment or combination of impairments that is severe that meets the durational requirement.  (Doc. No. 15 at 12.)  Wentz argues the ALJ failed to consider all the evidence of record in this case, as his decision fails to consider Wentz's diagnosis of fibromyalgia.  (*Id.*)  This failure, Wentz maintains, proves "fatal to his analysis at the remaining steps of the sequential evaluation process."  (*Id.*)   Further, Wentz asserts the ALJ's omission of any discussion of her fibromyalgia resulted in a "faulty credibility finding," as the "lack of objective medical evidence" is the "norm" in fibromyalgia cases.  (*Id.* at 13.)

The Commissioner responds that the ALJ's omission of Wentz's fibromyalgia at Step Two is not a basis for remand because he found other severe impairments at that step and continued through the sequential analysis.  (Doc. No. 17 at 10-11.)   According to the Commissioner, Wentz's "complaint challenging the ALJ's consideration and alleged omission of her fibromyalgia is more properly framed as a challenge to the RFC."  (*Id.* at 11.)  In his RFC argument, the Commissioner argues, "By giving [the state agency reviewing consultants'] opinions 'great weight' when formulating the RFC, the ALJ complied with SSR 12-2p and also implicitly considered [Wentz's] fibromyalgia in crafting the RFC."  (*Id.* at 15) (citation omitted).

26

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR § 404.1521; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment."  SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006);[5] 20 C.F.R. § 404.1513(a).  "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  SSR 96–4p, 1996 WL 374187, at *1.  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. § 404.1529(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919

---

[5] SSR 06-03p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* 82 Fed. Reg. 15263 (March 27, 2017).  As Wentz's application was filed in November 2016, this Court applies the rules and regulations in effect at that time.

(N.D. Ohio March 30, 2017). The claimant bears the burden of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require."). *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations. *See* 20 C.F.R. § 404.1520(a)(4)(ii). As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ." 20 CFR § 404.1520(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.*

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985). *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996). This is because "[w]hile a 'not severe'

28

impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*. "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 2009 WL 4981686 at * 2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

The ALJ did not mention Wentz's fibromyalgia at Step Two, although he found other severe impairments.  (*Id.* at 20.)  Nor did he mention Wentz's fibromyalgia at the remaining steps of the sequential evaluation.  (*Id.* at 20-26.)  In his subjective symptom analysis, the ALJ found as follows:

> The undersigned has considered several other factors in assessing the consistency of the claimant's subjective complaints with the overall evidence of record pursuant to Social Security Ruling (SSR) 16-3p. The claimant's statements regarding the location, duration, frequency and intensity of her symptoms are generally not supported by the medical evidence. For example, her musculoskeletal exams in 2017 generally showed good range of motion, no swelling or effusion in the joints, and no weakness. (8F/20; 16F/7). Similarly, the claimant's statements regarding precipitating and aggravating factors are not supported by the medical records. For example, on neurological exams, she exhibited normal sensory and motor function, without deficits, as well as intact

29

reflexes. (9F/11, 33). For these reasons, the undersigned finds that the claimant's allegations are generally inconsistent with the record. (SSR 16-3p).

(Tr. 22.)

Later in his RFC analysis, the ALJ determined:

While the medical record, evidence and testimony demonstrates a basis for the claimant's symptoms, the undersigned finds that the claimant's allegations regarding the severity and limiting effects of the disorders are not fully supported. The medical record shows the claimant was diagnosed with status post right shoulder arthroscopy, arthritis, lumbar sacral spondylosis, (8F; 17F; 19F/2). X-rays in 2016 of the lumbar spine showed mild lumbar scoliosis and spondylosis, however, there was no evidence of endplate arthropathy. (8F/26; 9F/20). She underwent a right shoulder arthroscopic procedure in June of 2017. (19F/2; 9F/50). Imaging studies in 2017 showed mild medial joint space narrowing in her knees. (8F/16; 9F/17). She exhibited abnormal gait, restricted range of motion and upper extremity weakness on some physical exams in 2017. (8F/26, 9F/3). She has attended physical therapy, with some relief of symptoms. (8F/43; 17F).

However, in 2017, imaging studies showed improvement from 2016; the claimant had normal lumbar and cervical spine studies. (17F/12; 16F/10; 9F/22). Additionally, she generally had unremarkable physical exams. Specifically, her musculoskeletal exams in 2017 generally showed good range of motion, no swelling or effusion in the joints, and no weakness. (8F/20; 16F/7). Records showed that she recovered well from her shoulder procedure. (19F/2; 16F/7). On neurological exams, she exhibited normal sensory and motor function, without deficits, as well as intact reflexes. (9F/11, 33). Given the medical record and claimant's testimony, the claimant's impairments can be reasonably accommodated with a residual functional capacity of less than a full range of light work.

(*Id.* at 23.)

The Court finds the ALJ failed to properly analyze Wentz's fibromyalgia. SSR 12-2p describes fibromyalgia ("FM") as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12–2p, 2012 WL 3104869, at *2 (July 25, 2012). SSR 12–2p explains fibromyalgia is a "common syndrome" and that a person's symptoms must be considered when the agency decides if the individual has a medically

determinable impairment ("MDI") of fibromyalgia.  *Id*.  Pursuant to the Ruling, "FM is an MDI when it is established by appropriate medical evidence," and the disease "can be the basis for a finding of disability." *Id*.  Only a licensed physician can provide evidence of an MDI of FM, but the physician's diagnosis alone is insufficient.  *Id*.  Rather, the evidence must "document that the physician reviewed the person's medical history and conducted a physical exam."  *Id*.  The agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities."  *Id.*

The Agency will find that a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record.  *Id*.  Under § II.A, the agency "may find that a person has an MDI of FM if he or she has all three of the following":

1. A history of widespread pain-that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months' and which "may fluctuate in intensity and may not always be present;"

2. "At least 11 positive tender points on physical examination" which must be found in specified locations;[6] and

---

[6] SSR 12–2p requires a finding of "[a]t least 11 positive tender points [which] must be found bilaterally (on the left and right sides of the body) and both above and below the waist" and which are located on each side of the body.  SSR 12–2p, 2012 WL 3104869, at *3.  The tender points are located at the following 18 sites: Occiput (base of the skull); Low cervical spine (back and side of the neck);  Trapezius muscle (shoulder); Supraspinatus muscle (near the shoulder blade);  Second rib (top of the rib cage near the sternum or breast bone); Lateral epicondyle (outer aspect of the elbow); Gluteal (top of the buttock); Greater trochanter (below the hip); and Inner aspect of the knee.  *Id*.  The Ruling provides that in performing the testing, "the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The

     3. Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as "imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)."

*Id.* at *2–3.  Alternatively, a person may be found to have a medically determinable impairment of fibromyalgia under § II.B of SSR 12-2p if she has all three of the following criteria:

     1. A history of widespread pain as described under § II. A.;

     2. "Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and

     3. Evidence that "other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Id*. at 3.  Co-occurring conditions include depression, "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome."  *Id*. at n.10.

     As the Commissioner acknowledged in his brief, "this [is] a case involving fibromyalgia."  (Doc. No. 17 at 14.)  Wentz asserted she was disabled because of her fibromyalgia and other impairments.  (Tr. 477.)  At the hearing, Wentz's attorney focused on Wentz's fibromyalgia during her opening statement to the ALJ.  (*Id.* at 1580-81.)  Yet the ALJ failed to mention fibromyalgia at any point in his decision.  In his RFC argument, the Commissioner argues the state agency reviewing physicians considered Wentz's fibromyalgia a severe impairment, and so by giving their opinions "'great weight' when formulating the RFC, the ALJ complied with SSR 12-2p and also implicitly considered [Wentz's] fibromyalgia in crafting the RFC."  (*Id.* at 15) (citation omitted).  This argument is without merit.

---

physician considers a tender point to be positive if the person experiences any pain when applying this amount of pressure to the site."  *Id*. at § II.A.2.b.

First, the state agency reviewing physicians issued their opinions in early 2017 (Tr. 484-86, 499-501), and considerable medical evidence in the record post-dated their opinions.

Second, the ALJ's subjective symptom evaluation and RFC analysis highlight the ALJ's failure to properly address Wentz's fibromyalgia considering the unique characteristics of that condition.  As noted above, in determining Wentz could perform a reduced range of light work, the ALJ emphasized Wentz's treatment records showing "unremarkable physical exams."  (*Id.* at 22-23.)  Specifically, the ALJ cited findings of normal range of motion, "no swelling or effusion of the joints," no weakness, normal sensory and motor function, and intact reflexes as a basis for his conclusion that Wentz was not disabled during the relevant time period.  (*Id.*)  It is clear, however, that the lack of "objective" medical evidence is not unusual, but rather the norm in fibromyalgia cases.  *See Rogers*, 486 F.3d at 244 (noting CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity"); *Preston v. Sec'y of Health & Human Svcs.*, 854 F.2d 815, 817-818 (6th Cir. 1988) ("There are no objective tests which can conclusively confirm" fibromyalgia); *Keating v. Comm'r of Soc. Sec.*, No. 3:13-CV-487, 2014 WL 1238611, at *6 (N.D. Ohio March 25, 2014) ("This circuit has recognized that symptoms of fibromyalgia are often not supportable by objective medical evidence"); *Schlote v. Astrue*, No. 1:11-cv-01735, 2012 WL 1965765, at *6 (N.D. Ohio May 31, 2012).

Similarly, the fact that physical examinations often yielded normal findings is not necessarily inconsistent with fibromyalgia.  Indeed, the Sixth Circuit has repeatedly and consistently recognized that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion."  *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 861-862 (6th Cir. 2011) (citing *Preston*, 854 F.2d at 820).  *See also Starcher v. Comm'r of Soc. Sec.*, No. 2:15-cv-3113, 2016 WL 5929048, at *6 (S.D. Ohio Oct. 12, 2016) ("As SSR 12-2p indicates, and as the case law has established, a fibromyalgia sufferer can present to a physician without any significant objective signs or symptoms.");

33

*Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion"); *Keating*, 2014 WL 1238611, at *6.

As this Court has noted on previous occasions, "[it] is incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent" when evaluating fibromyalgia claims. *Schlote*, 2012 WL 1965765, at *6. Here, the ALJ failed to properly analyze Wentz's fibromyalgia at Step Two, which, in turn, improperly influenced the ALJ's analysis of Wentz's limitations in the RFC analysis. As other courts have explained, "[t]he error is therefore not harmless, or, at least, the Commissioner has not carried the burden of showing that it was, and a remand is required in order for the ALJ properly to evaluate the case in light of the diagnosis of fibromyalgia." *Starcher*, 2016 WL 5929048, at *6. *See also Howell*, 2018 WL 565682, at *12.

Accordingly, the undersigned recommends this matter be remanded for further evaluation of Wentz's fibromyalgia at Step Two and to re-evaluate the physical limitations in the RFC.

**B.    Cane Usage**

Wentz asserts the ALJ noted in his decision that she "has been using a cane for balance since April 2017." (Doc. No. 15 at 14) (citing Tr. 22). But in his RFC determination, the ALJ determined Wentz needed a cane only for ambulation. (*Id.*) Wentz argues the ALJ's decision "is devoid of any discussion as to how he arrived at this conclusion." (*Id.*) Therefore, the ALJ failed to build the requisite "accurate and logical bridge between the evidence and the decision." (*Id.*) (citation omitted).

The Commissioner responds that Wentz's position lacks support by the medical records, "including from the cane-prescribing doctor." (Doc. No. 17 at 13.) The Commissioner asserts, "The RFC mirrors the prescribing doctor's orders that the cane was to be used for walking." (*Id.* at 14) (citations omitted).

34

In her reply, Wentz argues the Commissioner "attempts to offer an explanation as to why the ALJ limited [Wentz's] use of the cane to only ambulation," but such attempt constitutes impermissible *post-hoc* rationalization.  (Doc. No. 18 at 2.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a).   A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 404.1527(d)(2).[7]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 404.1546(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

The ALJ is obligated to consider the record as a whole.  *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985).  "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  "'[W]here the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.'"  *Davidson v. Comm'r of Soc. Sec.*, No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018) (quoting *Moscorelli v. Colvin*, No. 1:15-cv-1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016)) (citing SSR 96-8p, 1996 WL 374184,

---

[7] This regulation has been superseded for claims filed on or after March 27, 2017.

at *7); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-cv-67, 2018 WL 6287996, at *5 (S.D. Ohio Dec. 3, 2018) ("[W]here, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so.") (citations omitted), *report and recommendation adopted by* 2019 WL 95496 (S.D. Ohio Jan. 3, 2019). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her*, 203 F.3d at 391.

An ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision."  *Boose v. Comm'r of Soc. Sec.*, No. 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014).  This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion.  *Snyder*, 2014 WL 6687227, at *10 (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

The treatment records from April 2017 where Drs. Lee and Lewis prescribed Wentz a cane include the following notations: (1) "CANE for stability"; (2) "Gait Instability – ICD9:781.2, ICD10: R26.81 2/2 pain from fibromyalgia – CANE"; (3) "Cane devl" – "Use for ambulation. Use with left arm only. Diagnosis: Instability (R26.81), fibromyalgia (M79.7)."  (Tr. 935, 938.)  In his RFC analysis, the ALJ acknowledged Wentz testified she "has been using a cane *for balance* since April of 2017."  (*Id.* at 22) (emphasis added).  However, the RFC itself states Wentz "requires a cane for ambulation."  (*Id.*)  The ALJ did not explain how he arrived at that conclusion despite acknowledging Wentz's testimony that she had been using a cane for balance since April 2017.  Nor did the ALJ cite or discuss the April 2017

36

treatment notes where Drs. Lee and Lewis prescribed Wentz a cane.  Wentz's use of a cane for balance is significant, as the VE testified that using a cane for balance would preclude the jobs he identified at the light exertion level and limit an individual to a sedentary position.  (*Id.* at 1603.)  Given Wentz's age, education, and previous work experience, an RFC finding of sedentary would result in a finding of disability under Rule 201.09 of the Medical-Vocational Guidelines.  20 C.F.R. Pt. 404, Subpt. 2, App'x 2.

As discussed above, the ALJ committed reversible error by omitting any discussion of Wentz's fibromyalgia in his decision.  On remand, the ALJ will have an opportunity to reconsider and properly articulate his RFC findings, considering all relevant evidence in the record.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED.

Date:  January 6, 2020                          *s/ Jonathan Greenberg*
                                                Jonathan D. Greenberg
                                                United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**